Let's take up the next case in the interest of K.E.M. and K.A.N. Meyers. All right, argument on behalf of the appellate. Please proceed, Counselor. Good morning, and may it please the Court. My name is Andrew Flynn, and I represent the respondent appellate in this matter, Ms. Suzy Davis. There are really two issues presented this morning. The first one is whether the Circuit Court erred in determining Ms. Davis was an unfit person pursuant to the Illinois Adoption Act. Second, whether the Circuit Court erred in improperly determining Ms. Davis' parental rights prior to a hearing on the determination of the best interest of the children. This morning I'll address the latter issue. The involuntary termination of parental rights is broken down into a bifurcated two-step process. First, the State has the burden of proving beyond clear and convincing evidence, or excuse me, by clear and convincing evidence, that a person is unfit. If and only if that burden is met, then the Court moves on to a second stage to determine whether termination of parental rights is in the children's best interest. I thought that the judge initially was going to do that, and then he said, oh, it was stopped, and he did backtrack and go the other way. He did, Your Honor. He stated, I'm terminating your parental rights. The State reminded him, essentially, judge, you can't do that. And then he stated, oh, you're right, I can't do that. So what you're arguing is something he did. Then he did have a hearing on that. He did. But the argument is essentially he could clearly, the Court had clearly made its decision already prior to determining the best interest of the children. So you're saying he would never go the other way no matter what happened? Yes. And not only after he was reminded that, hey, you can't do that, the Court went on and said, you shouldn't have these kids. So he said, I'm terminating your parental rights, was reminded, judge, you can't do that, then said, oh, you're right, but you're unfit, you can't have these kids. Counsel, did trial counsel raise this issue before the trial court? And I'm suggesting maybe such as, judge, with the statements you've made, I'm going to file a motion to accuse you of cause. Was that raised at the trial court? It was not, Your Honor. Then a week later they held the best interest hearing, and then the parental rights were terminated. So like I mentioned, the argument here is, yes, the best interest hearing was held, but based on the Court's statements, it's clear that the Court made its decision prior, which directly is an opposite to the requirement of a bifurcated two-step process. The Court isn't supposed to consider what happened at the first stage in determining the best interest of the children. But in this case, the Court clearly did that, made its decision, went through the, I would say, I would call it a guise of a best interest hearing, even though we already knew what the decision was going to be. But you did have a best interest hearing. Yes. And evidence was presented? Yes. So he could have gone the other way, but he didn't. It's possible that the statements, I would say, implied that that was not going to happen. And again, those were multiple statements. Now, the second issue is whether Ms. Davis was an unfit person, whether the state proved beyond clear and convincing evidence that she was unfit. Now, the Court found two reasons for Ms. Davis' unfitness. The first was whether she made a reasonable effort to correct the condition that caused the children to return in the first place. And the second, they found that she made no reasonable progress towards the return of the children. Now, in relation to that first finding of making a reasonable effort to correct the condition for the removal of the children, the only reason listed for removal of the children was homelessness. Ms. Davis did exactly what we would want any parent in that situation to do. It was January. She had no place to go with her children. She went to the police station and called DCFS for help. That's it. That's the only thing that caused this case. Now, did she have five children at that time or seven? She had five children at that time. Okay. And this case revolves around two children, which were later born. Okay. So, she did what we would want any parent to do, ask for help, which is what she did. She wanted a place for her children to sleep in January at night. So, that first, the only issue was homelessness. So, when we look at what Ms. Davis did in an effort to make reasonable efforts to correct that, she immediately got housing. The record reflects that the petition for adjudication was filed in August of 2011. And the first report that we have on the record, which was in November, she had already acquired a home, a two-bedroom apartment. And initially, the only thing that was even negatively stated about the apartment is that she didn't have enough furniture yet. But everything else was fine. Now, when she got the two-bedroom apartment, the five children were with DCFS, right? Yes. Throughout the whole pendency of this matter, the children were never. Okay. She did visit with them weekly, but they were never, I mean, they came to the apartment to visit. Right. So, she had this initial two-bedroom apartment. After, the first time, they said not enough furniture. After that, all of her reports say everything looks great. It's always clean and tidy. She acquired the appropriate furniture. And then, not only did she have this two-bedroom apartment, she goes ahead and acquires a four-bedroom house through Section 8 housing assistance. And she has the two-bedroom apartment straight to the house. It's an upgrade, if you will. And she has these houses, these living situations, for in excess of over a year while this case is pending. Again, the only reason the children were taken from homelessness, she has a home for over a year. But there were additional charges that there was domestic abuse and violence going on. That came in later, yes, it did. Well, I mean, you need to address it. That certainly could come in later and still be considered. Absolutely, Your Honor. I was going to do housing and everything. Okay. But essentially, she had housing. And then, even though she has this housing, they changed the plan from return home to substitute care pending termination of her rights. Now, she did lose the Section 8 four-bedroom house, and the reasoning for that was she didn't have her children back. She had the house for, I believe, six to eight months, and Section 8 was like, we can't give one person such a big house. You don't have the children. We need the house back. So there was a time period where she – the record isn't exactly clear. It appears anywhere from six months to a year where she didn't have housing. But after – and the whole time, the record is clear. She was looking for housing, was having trouble finding it. She still – she wasn't on the streets. She was living in with friends in an apartment in a hotel. But then she did find housing, a two-bedroom apartment in Marion, about a year prior to the termination hearing. This is the same house or same apartment that was approved by every report. Everything's fine. And it's the same house she lived at through the hearing and to this day. I'm calling for housing. I'm just wondering why you're spending all this time on housing when this is a woman who had contacted the police 24 times in one year related to domestic violence. So in relation to the domestic violence, the record is clear that she was a victim of domestic violence. Absolutely. I'm not contesting that. But is that an environment that children should be in? Absolutely not. And Ms. Davis broke up or ended her relationship with the alleged – or the abuser a year prior to the hearing. But DCFS and the state continue to use her being a victim of domestic violence against her. The record is clear.  This was the father of the children. But, I mean, after a while, she was abused and she broke off her relationship. Again, I believe she broke off the relationship in October of 2014, which was about a year prior to the hearing. But they still continue to use it against her. And any acts of domestic violence, obviously these are serious acts. None of them were before the children. There's nothing that Ms. Davis – Don't say children. I want to mean the two or the five. All of them. Oh, okay. The two, the twins, were never in her custody, correct? No, they were taken from the hospital. Right. And just for clarification, they're not twins. Oh, they aren't. Born August 2011 and August 2012. Oh, I'm sorry. But none of these incidents of violence ever occurred in front of the children. Only because they weren't there. I mean, there was – that was one of the reasons why there was not a return of the children is because of the domestic violence. Well, in relation to the domestic violence, they did make her go to counseling. And she – well, she got a domestic violence evaluation, and then she went to weekly counseling. And she successfully completed that. And again, she was always the victim of these acts and broke off the relationship with the abuser, again, a year before the hearing. So I don't know what else she's supposed to do, being a victim of domestic violence, other than separate herself from the abuser, which she did. So, you know, initially, as we discussed, the only requirements were get a job, get housing, and take a psychological evaluation. She got a job immediately. I believe the record is clear that she had a job even before the petition for adjudication came out. She had that job for about a year. She has had some fluid employment, but she's always working. She sometimes, I think still currently, has two jobs. And that's something else they tried to use against her. Well, you're working too much. How are you going to care for these children while you're working so much? So you can't have the kids because you don't have a job, but now you're working too much, how are you going to care for them? It's similar to the domestic violence. You're a victim of domestic violence. We're taking the kids away. And so she completed that. They kept adding things for her to do. She would do them. They added parenting classes. She successfully completed the parenting classes. They added a mental health evaluation. She successfully completed the mental health evaluation. Then they added mental health counseling, which was every week. She successfully completed that. They required her to do budgeting, monthly budgeting, to show she could keep track of her money and pay her bills. She did that. So literally everything they asked her to do, she did. And keep in mind, typical cases have a few service plans. She had 17, 17 different service plans administered by six different caseworkers. One of the caseworkers was removed from the case. Now, the reason isn't in the record, but there is a motion in the record that reflects she was marking things unsatisfactory, which they were supposed to be satisfactory. And there's a general vibe of noncompliance throughout the record, but those are just statements. If you actually look at what was being done, it couldn't be further from the truth. Everything says she was complying, she was doing it, she was working on it. Well, I'm looking at the state's brief, and it may be what you're saying is true, and it says the mother had either been unemployed or homeless throughout most of the case. And that's false. That's false. Okay. Well, we'll see the record. Yeah. The record shows it's vague. There isn't a report from January 2013 through March 2014. So I'm unsure of exactly when Ms. Davis lost the four-bedroom home, but she acquired the two-bedroom apartment that she's currently in in August of 2014. So there is a time period in there. I'm not sure of the exact dates. But she's always been employed. The state continues to argue, you know, habitually losing homes. There's one instance of losing a home, and that was the four-bedroom house that Section 8 said we can't give a four-bedroom house to one person. That's the only time she lost a home in this case. As far as employment, there is some fluidity in the employment record, but it's always attempts to work. There's no time when she's just sitting down not even trying. Even if that's the case, if she has no income and she has marginal income, because it says right here her bills in 2012 that she had no money to pay her bills, how is she going to provide a safe, stable environment for the children? Well, she does have income. She is working two jobs. I believe the allegation in the state's brief is relating to there was one report where DCFS or CASA, I can't remember exactly which one, said she showed me her bills and I don't know how she's paying for it. It doesn't say she can't pay for it. That's it. So, you know, it essentially comes down to this. The only thing she did wrong was be poor. And, I mean, there's no allegations of alcohol abuse, drug abuse, physical abuse caused by her or in front of the children, no mental abuse. There's nothing she did wrong other than ask for help when we want people to ask for help. So to take someone's children away, it's just, you know, to be honest, I don't believe that that's what this case, it's not what this system was set up for. Did she complete her mental health counseling? Yes. She did. And was it considered satisfactory? The only negative thing they said about her, they said she satisfactorily completed it, but they made statements to the like of she still doesn't understand how, I'm getting the phrasing wrong, but she doesn't understand how her situation can affect the kids or something to that effect. But, again, it's just there's a lot of statements in here without support, like the noncompliance statement, like that statement. She successfully completed it, but there's a problem. There's a lot of statements in the transcript. She's not doing anything, Judge, but every report says she's doing everything. So if you really look through the record, it's like the heading says unsatisfactory, but the body of the work says she's done everything we've asked her to do. We keep asking her to do more stuff. She keeps doing it, but we don't want her to have these kids for no real recognizable reason. So as far as the two findings of the court for reasonable effort, reasonable progress, there's no doubt she made a reasonable effort. I think she downright fixed the problem as far as having housing and the progress for everything else with the domestic violence, the mental health counseling, the budgeting, the parenting classes, literally everything. There wasn't progress. It was completed. So we would respectfully request that this case be reversed and remanded down with instructions to the lower court. Again, no drugs, no alcohol, no physical abuse other than her being victimized, nothing. Do your honors have any questions? I don't think so. Thank you, Counselor. I have a chance for rebuttal. Argument on behalf of the state. May it please the court, Whitney Atkins for the state of Illinois. Also here in the interest of the children, KEN and KAM, counsel. So the mother here, Susie, she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors. That was the first ground upon which the trial court found that she was unfit. So DCFS, Department of Children and Family Services, got involved with this case because Susie was homeless. She was unable to provide shelter to her children, KEN, KAM. She had fallen on hard times. She was living at her mother's house and her mother had thrown her out and she had no place to go. Prior to August 2014, Susie had been homeless for approximately a year. And these are her own words. This is her own testimony that she was homeless for a year. That alone substantiates unfitness. Further, the caseworker, Ashley Amberger, who was the caseworker from December 2013 until close, testified that in the July 2013 service plan and the January 2014 service plan, was unsatisfactory because she was homeless. And so logically, being able to earn an adequate amount of income was an issue for Susie. And it was an issue throughout the case. She struggled to maintain income. And a CASA report filed April 13, 2012, it was reported she was unemployed. A permanency report filed May 8, 2012. She lost her job at Timberline and had not obtained a new job. She had no means to support herself. A permanency report dated September 26, 2012, the one that Justice Cates referred to. She was unemployed and she had bills that amounted to $942, was not able to substantiate how she was going to pay those bills. CASA report filed November 26, 2012. Again, she remained unemployed. Permanency report filed November 2014. She was let go of her job. So no, she was not able to maintain a job and housing throughout this case. Most of this case, she either didn't have a job or she didn't have housing. And a lot of times the only reason why she had housing is because it was public housing. So the second ground upon which she was found unfit was that she failed to make reasonable progress towards the return of the minors. This basis is measured by compliance with service plans. At the time that Ashley Amberger, the main caseworker, was assigned this case in December 2013, the mother had not completed one single service plan. And at the time that, from June 2013 until the petition to terminate was filed in August 2014, the mother had not been rated satisfactory on a single service plan. So most of the time the case was open, she did not complete her service plans. I noticed that, I heard counsel say that she had completed mental health, Justice Chapman asked had she completed mental health counseling. She did complete it after the petitions were filed. So that, you know, obviously that will not do. Can that be considered? Let's see, can that be considered? Well, it's unhelpful for it to be considered because by that time she had acquired nine months of not finishing her mental health counseling. So it does no good to consider it. It's not helpful for her. And some of the reasons that she did not satisfy these service plans was not just housing and income, but in 2013 a service plan said that she was not consistent with the goal of psychological counseling. May 2012 report, she was doing some of the services but not all. So she wasn't completing these services. Obviously the task of housing was not being completed. Income was not being completed. And as far as the domestic violence, I noticed that counsel said it came in later. It has been an issue since the commencement of this case. There were calls dating as far back as fall of 2010 of domestic violence disputes between the mother and father. And, I mean, I think we can presume she was a victim. And then in November 2014, she absolutely was a victim. And it was probably, it sounds like, the worst battery committed against her. And that was pretty late in the case. I mean, we're talking November 2014. So for most of this case, she did not really get out of that abuse. She was not able to break away. So due to her being unable to complete her service plans, due to her being homeless, her own words for a year, due to her inability to consistently maintain income, we would ask that the child court's finding of a fitness not be disturbed. And I just want to briefly just address the issue that Suzy has raised regarding the child court prematurely finding that her rights were terminated. If you look at the exchange between the court and the state's attorney, it's just so obvious that he misspoke. The process is, the terminology, it's kind of confusing. It's really easy to kind of mix up, I myself mix up, you know, terminating unfit. You know, it's, he quickly corrected himself. He indicated that he was just making a decision on the first stage. He explicitly said, I am just making a judgment on the first stage. Those are his words. And then he proceeds to set, immediately after that, he proceeds to set a date for the second stage. And the judgment terminating Suzy's rights didn't occur until after the second stage. And I think, as Justice Storm used to point out, the fact that there was no post-hearing motion, it further evinces that everybody there understood that he misspoke. He wasn't making a premature judgment. So for these reasons, we ask that you affirm the child court's finding of unfitness. Thank you. Rebuttal argument? Thank you. Just briefly on that last issue, if the court didn't misspeak, it misspoke twice. Initially, reminded, then said it again. Just to clear up one thing, because it is ambiguous in the record, Suzy's five other children have not been terminated. So the record doesn't reflect that, but they have not been terminated. I'm sorry, the record does or does not? I mean, the record, and I don't think it says it, and it's kind of ambiguous if you don't know the case, because the record doesn't talk about the five other kids. So we shouldn't consider it? So we shouldn't consider that? Just that. Well, I was curious if it came out in the trial, but if it did not, then it's not in the record. Counsel, you shouldn't be arguing if it's not in our record on this case. I apologize. It did come out in the record because they called the parties as witnesses who had temporary guardianship of the other children. So it did come out in the record. As far as the state's arguments, there was a period of time of homelessness during while the case was pending, but again, she had acquired a home for over a year prior to the hearing up through the present date. The only records of unemployment are back in 2012 when she was searching for employment after she had gotten laid off, when she had that job for a year, and then a brief stint in 2014 before she found new employment. The state argued that she only had housing because of public aid. Well, using public community assistance was one of the requirements of her service plan. One of the requirements was literally use public aid, and she did. And again, the allegations that none of these service plans were ever satisfactory, they did say that, but again, that's the headache. If you look at the body of what was actually completed, she did complete these service plans. The mental health counseling was completed after one of the petitions was filed, but that was a weekly thing she was required to do. She didn't start going to weekly counseling after the petitions were filed. She was going and just hadn't completed the requisite amount of classes, and then she did complete it before it ever went to hearing. And again, if you look at the requirements of Susie, find work, go to work, go to counseling every week for mental health, go to domestic violence counseling every week. This is not a one-time thing. She was doing these tasks weekly. She didn't miss. She was giving weekly visits with her children, never once missed. She enjoyed the time with her children. She always brought them gifts and toys and things of that nature. The children effectively referred her as Mama Susie. One of the big things the state harped on was, well, they don't have a bond. Well, I think the record completely puts that. They do have a bond. They call her Mama Susie. They were angry they didn't spend more time with her. But also, you took the children from the hospital. She's visiting them every chance she gets, but you're saying, well, you don't have a bond with them. I mean, that's not Susie's fault. She did everything she possibly could to create a bond and maintain that bond. And just to clear up, counsel brought up that I said the domestic violence came in later. What I meant was that is the requirements of domestic violence classes weren't in the initial service plans. They came in later. So do your honors have any other questions? I don't think so. Thank you, counsel. Thank you for your briefs. The arguments will take this case under advisement and issue a written decision. Court will be in recess. All rise.